UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

| | |
|---|---|
| AVERY LADD, individually and on behalf of all others similarly situated,<br><br>v.<br><br>WHIRLPOOL CORPORATION | Case No. 1:22-cv-00330-RJJ-PJG<br>FLSA Collective Action<br><br>Judge Robert J. Jonker<br><br>Magistrate Judge Phillip J. Green |

**LADD'S SUPPLEMENTAL MEMORANDUM IN
SUPPORT OF SETTLEMENT APPROVAL**

**A.   SUMMARY**

Ladd addresses each of the four issues raised in the Court's Order of November 22, 2023. ECF No. 55.

**B.   ARGUMENT & AUTHORITIES**

**1.   Errant settlement figures.**

As the Court observed, Ladd's brief in one instance errantly noted the amount referred to by the Parties' Settlement Agreement as the "Gross Settlement Amount" as $1,550,000. ECF No. 55, at PageID.306. That figure was a drafting error by Ladd's counsel. As otherwise referenced in Ladd's brief and the Settlement Agreement, **the correct amount is $1,775,000**. ECF No. 50-1, at PageID.204 § 7(c).[1]

Likewise, Ladd's brief stated two different figures (one correct and one incorrect) for the amount that Whirlpool would commit not to recoup. **The correct amount is "approximately" $3,485,371.28**. ECF No. 50-1, at PageID.203 § 7(b).[2] The other, lower figure reflects the amount of the same category of recovery (non-recoupment) from another

---

[1] The Settlement Agreement is the definitive source of this amount.

[2] Likewise, the Settlement Agreement is the definitive estimate of this amount.

Kronos outage settlement approval motion. Ladd's counsel overlooked updating the errant figure when adapting the brief for use in this case.

Ladd's counsel hopes this clarifies these figures and apologizes for any confusion.

### 2.  Clarification of amount and calculation of attorneys' fees.

The specific amount of proposed attorneys' fees is $710,000. This amount is a constant which is determined by calculating 40% of the "Gross Settlement Amount" / "new settlement funds." ECF No. 50-1, at PageID 206 § 10(a). This results in total attorneys' fees of 13.49% of the overall gross settlement obtained for the collective.

The reason for variation of the lodestar referenced in Ladd's brief was not due to any change in the amount of the settlement. Rather, the lodestar range was presented due to the variation in hourly rate benchmarks set forth in the State Bar of Michigan's 2023 Economics of Law Survey Results. *See* ECF No. 50, at PageID 264 fig. These percentages account for the range of hourly rates reported within the Survey (and calculated by Ladd's counsel between the mean, 75th, and 95th percentile of reported hourly rates). Adopting the same format of Ladd's hourly rate chart for a lodestar analysis illustrates the high and low lodestar figures in Ladd's brief:

| Category | Hours | Mean | 75th % | 95th % |
|---|---|---|---|---|
| Overall Average Hourly Rate[3] | --- | $382.25 | $458.13 | $641.25 |
| | | | | |
| Lodestar Current Hours | 260 | $ 99,385.00 | $ 119,112.50 | $ 166,725.00 |
| Lodestar Total Hours Post-Disbursement | 320 | $ 122,320.00 | $ 146,600.00 | $ 205,200.00 |
| | | | | |
| Lodestar Multiplier – Current Hours | 260 | 7.14 | 5.96 | 4.26 |

---

[3] This row is reproduced from the hourly rate chart in Ladd's original memorandum for ease of reference.

| Category | Hours | Mean | 75th % | 95th % |
|---|---|---|---|---|
| Lodestar Multiplier – Total Hours Post-Disbursement | 320 | 5.80 | 4.84 | 3.46 |

As Ladd's underlying brief explained, Ladd's counsel believes that—based on their extensive experience in wage-and-hour cases in general, and Kronos outage claims in particular—the use of the 95th percentile for calculating the lodestar cross-check is appropriate in this case, which would result in a 4.26 multiplier for the hours expended as of the time of Ladd's initial brief and a 3.46 multiplier by the time this matter is ultimately closed.

3. **Approval of attorneys' fees.**

3.1. **The absence of a kicker clause favors settlement approval.**

As the Court correctly observed, the parties' settlement agreement would reallocate unapproved attorneys' fees to the proposed collective instead of allowing them to revert to Whirlpool. ECF No. 55, at PageID.307. This reflects the generally preferred method of handling such unapproved fees.

A clause allowing unapproved fees to revert to a **defendant** is called a "kicker clause." *O'Bryant v. ABC Phones of N. Carolina, Inc.*, No. 2:19-CV-02378, 2020 WL 4493157, at *17 (W.D. Tenn. Aug. 4, 2020). Courts are generally "wary" of such clauses. *Id.* They **may** warrant a heightened duty to scrutinize the settlement. *See Gascho v. Glob. Fitness Holdings, LLC*, 822 F.3d 269, 291 (6th Cir. 2016); *see also In re Bluetooth Headset Prod. Liab. Litig.*, 654 F.3d 935, 947 (9th Cir. 2011) (categorizing a kicker clause as "indicia of possible implicit conclusion").

In other words, while the Court here is rightfully exercising its duty to scrutinize the settlement, the absence of such a kicker clause—which assures that unapproved funds would be reallocated to the settlement collective—is protective of the settlement funds, reflects an

absence of "collusion," and is in the best interest of the proposed collective. *O'Bryant v. ABC Phones of N. Carolina, Inc.*, No. 19-CV-02378-SHM-TMP, 2020 WL 7634780, at *16 (W.D. Tenn. Dec. 22, 2020) ("The Court previously rejected the reversion of unapproved attorneys' fees … to [the defendant]. Those clauses have been altered in the Amended Settlement Agreement. Any unapproved attorneys' fees will be distributed to the collective… Those changes to the reversion of unapproved fees and unclaimed settlement funds are reasonable." (internal citations omitted)). The absence of a kicker clause weighs in favor of approval.

### 3.2. Attorneys' fees should be measured by the relief made available.

The Court's Order also requests additional information regarding any concern that monetary value flowing to the proposed collective will not be known until after the notice period is closed and checks have been cashed. However, the proper measure of attorneys' fees is generally the amount made available to the class or collective, even if the amount collected by participating class and collective members may be less.

While the Sixth Circuit has not adopted the "made available" standard as a "strict rule"—leaving the final analysis in the district court's discretion—its opinion in *Gascho v. Glob. Fitness Holdings, LLC*, indicates the "made available" analysis is appropriate unless the settlement sets up a settlement structure that discourages claims. 822 F.3d 269, 287-88 (6th Cir. 2016).[4] "This respects the Supreme Court's position, as well as our own, that making

---

[4] *Gascho* explained that the Ninth and Second Circuits had set up such rules, awarding attorneys' fees on the entire fund "made available," regardless of the amount collected by plaintiffs. *Id.* at 283-84 (citing *Masters v. Wilhelmina Model Agency, Inc.*, 473 F.3d 423, 437 (2d Cir. 2007; *Williams v. MGM–Pathe Commc'ns. Co.*, 129 F.3d 1026, 1026–27 (9th Cir.1997) (per curiam)). It also observed the Eleventh and Third Circuits' decisions consistent with that position, which did not adopt it as a rule. *Id.* (citing *In re Baby Prods. Antitrust Litig.*, 708 F.3d 163, 178 (3d Cir. 2013); *Waters v. Int'l Precious Metals Corp.*, 190 F.3d 1291, 1296–97 (11th Cir. 1999)).

claims available to all class members provides them with a benefit." *Id.* at 286-87. For example, some settlements might require burdensome claims processing, extensive documentation, or confusing claims forms and websites. *Id.* at 288. Such circumstances might warrant valuing "potential relief as different from money in the plaintiff's pocket." *Id.*

Here, however, no such concerns exist for a number of reasons. First, the list of potential collective members is easy to define and notify, since all of them worked for Whirlpool and did so relatively recently. Second, they will be provided cash (or forgiveness), instead of coupons or other non-monetary relief. Third, the claims process is straightforward and easy. The only thing a potential collective member need do to participate is submit a claim form—there are no documentation or additional steps required. They can submit the form by mail or online through the third-party administrator.

In this case, Ladd's counsel has made readily available the relief to the entire potential collective. They have done their utmost to prioritize the direct benefit to the collectives. *See Gascho*, 822 F.3d at 284. If a collective member chooses not to participate, it simply cannot be said to be due to a claims process that discouraged claims. It is, in essence, no different than a client who resolves their case, is provided a check (from the defendant or even from their attorney's own trust account) but then elects not to cash the check.

Due to their work to make settlement funds readily available to the proposed collective, the correct measure for attorneys' fees here is the funds "made available" to the proposed collective members.

### 3.3. Disclosure of fees in collective notice.

At the Court's direction, Ladd has amended the proposed notice to disclose additional information about the attorneys' fees. A copy of the revised proposed notice is attached. *See* Rev. Ntc. of Settlement, at § 5.

### 4. Issues regarding non-recoupment.

### 4.1 Net overpaid employees may have FLSA claims.

The proposed settlement allocates some funds to employees that were overpaid as determined by calculating their net compensation during Whirlpool's Kronos outage because—notwithstanding their "net" overpayment—they may still have valid FLSA claims.

The "net" overpaid category results from reconciling employees' wages across the entire Kronos outage period, then applying debits and credits cumulatively across all pay periods or workweeks, for each employee, to determine whether—on the whole—the employee was "net" over-, under-, or correctly paid during that time.

While Ladd and Whirlpool have agreed to this method of calculating recovery **under the Settlement Agreement**, Ladd's theory of the case holds that this method of calculating and determining wages due violated the FLSA. *Shepard v. City of Waterloo*, No. 14-CV-2057-LRR, 2015 WL 9165915, at *19 (N.D. Iowa Dec. 16, 2015) ("[The goals of the statute and the statute's text support a finding that a particularized, rather than cumulative, application of the overtime credits allowable to the [employer] under §§ 207 (e)(5)-(7) is not only warranted, but **required**." (emphasis added)); *see also Haro v. City of Los Angeles*, 745 F.3d 1249, 1259-60 (9th Cir. 2014) (holding the employer may not aggregate workweeks to claim an offset for overpayments in one workweek against another workweek in which it underpaid its employee); *Howard v. City of Springfield*, 274 F.3d 1141 (7th Cir. 2001) (same, as to offsetting

on the basis of pay periods); *Herman v. Fabri–Centers of America, Inc.*, 308 F.3d 580 (6th Cir. 2002) (same). Indeed, cases conditionally certifying FLSA collectives stemming from the Kronos outage have done so (in part) based on this alleged FLSA violation. *Gaul v. Accura Health Ventures, LLC*, 651 F. Supp. 3d 1054, 1063 (S.D. Iowa 2023) ("There is nothing in the language of the FLSA or case law interpreting it to suggest this conclusion should change simply because Accura later stumbled its way into paying Gaul too much for subsequent pay periods. It had the obligation to get it right, on time, the first time."); *Thornton v. Tyson Foods, Inc.*, No. 5:22-CV-05077, 2023 WL 4712035, at *5, --- F.Supp.3d ---- (W.D. Ark. July 24, 2023) ("Thornton has demonstrated at least a 'colorable basis' that Tyson's policies violated the FLSA…. [P]ay must be credited on a 'period by period' basis rather than netted over multiple pay periods." (internal citation omitted)).

Thus, the "net" overpaid Whirlpool employees may nevertheless have an FLSA violation which the Parties resolved as part of their Settlement, and it is therefore reasonable that the parties included these employees in the Settlement.

### 4.2 Whirlpool's pre-litigation promise was not binding.

Although, as the Court observed, Whirlpool claimed it made a "pre-litigation decision" not to recoup overpayments, Ladd contended that Whirlpool made no such binding or contractual agreement to do so and—as a result—retained the right to change its mind and recoup these payments. ECF No. 55, at PageID.308.

The Kronos outage resulted in many employers' having "net" overpaid certain employees. Many of these employers began to (and continue to) recoup these overpayments. *E.g.*, FiercePharma, *Pfizer asks hourly staffers to return overpayments in aftermath of vendor's cyberattack: reports*, https://www.fiercepharma.com/pharma/pfizer-asks-staffers-return-

overpayments-aftermath-timeclock-service-cyberattack (Apr. 1, 2022); WSOC-TV, *Workers overpaid during cyberattack told they have to pay employers back*, https://www.wsoctv.com/news/local/workers-overpaid-during-cyberattack-told-they-have-pay-employers-back/CLPISHDASNAKLL4IIHQ4CTZ6XY/ (May 31, 2022); The Oregonian, *Oregon hospital is asking its employees to repay $2 million mistakenly paid in wages*, https://www.oregonlive.com/business/2022/08/st-charles-hospital-asks-employees-to-repay-2-million-in-wages.html (Aug. 13, 2022). At least one employer has successfully argued that it may have the right to claw back overpayments resulting from the Kronos outage, because applicable federal law does not preempt state law regarding such overpayments. *Washington State Nurses Ass'n v. MultiCare Health Sys.*, 535 P.3d 480, 490 (Wash. Ct. App. 2023).

For example, many affected employees (and potential collective members) in this case worked in Ohio. *See* ECF No. 50-1, at PageID.199 § i(ii). Ohio law, under the theory of unjust enrichment, has a six-year statute of limitations. Ohio Rev. C. § 2305.07(b). Thus, if Whirlpool relied on an unjust enrichment theory to seek recoupment of any alleged overpayment, it could do so for at least another four years. Other states, like Michigan, prohibit, or heavily regulate, an employer's deduction for overpayments from an employee's regular paycheck, MICH. COMP. LAWS § 408.477(4), but do not impose the same restrictions on actions to recover such wages. *Covenant Med. Ctr., Inc. v. Bagley*, No. 221CV11221TGBDRG, 2022 WL 3648176, at *6–7 (E.D. Mich. Aug. 24, 2022) ("It does not appear to regulate the recovery of overpayments or underpayments generally…. The text of the statute does not impose any overall restriction on the time period during which an overpayment may be collected by other means." (internal quotation omitted)). Like Ohio

then, Whirlpool could, for example, pursue an unjust enrichment theory regarding Michigan employees for another four years. *See* MICH. COMP. LAWS § 600.5807(9).

In all, by settling any potential claims, "net" overpaid potential collective members are receiving value from the Settlement, albeit on different terms than the sub-collective of "net" underpaid employees.

### 4.1. The subcollectives warrant differential treatment.

It is appropriate here that the subcollectives are treated differently. The differential treatment of each of these subcollectives does not create a conflict.

From the outset, the overpaid and underpaid subcollectives have different valuation of their claims. Even if the "net" overpaid subcollective members have valid FLSA claims (as Ladd contends they do), the value of these claim would likely be far less than those individuals who were underpaid—and thus went without wages for a longer period of time (despite the reconciliation) and have no offset. As such, the reallocation of unclaimed funds to underpaid individuals only is a valid, risk-based compromised based on the "greater difficulty members of that ["net" overpaid] Subclass would have in recovering further sums from Defendant through continued litigation." *Robles v. Comtrak Logistics, Inc.*, No. 15-CV-2228, 2022 WL 17672639, at *10 (W.D. Tenn. Dec. 14, 2022). And, critically, no individual within the subcollectives is treated differently. The settlement thus treats collective members equitably relative to one another within the same subcollectives. *Id.* So there is no conflict between the groups, and the Court should approve the proposed allocations.

## C. CONCLUSION

Ladd trusts this memorandum provides additional information for the Court's review in considering the Settlement Agreement. Ladd is glad to provide any further information at the Court's request, whether in an additional written submission or in oral hearing.

Respectfully submitted,

By: */s/ Matthew S. Parmet*
_____
**Matthew S. Parmet**
TX Bar # 24069719
**PARMET PC**
2 Greenway Plaza, Ste. 250
Houston, TX 77046
phone  713 999 5228
matt@parmet.law

**Michael N. Hanna**
MI Bar # P81462
**MORGAN & MORGAN, P.A.**
2000 Town Center, Suite 1900
Southfield, MI 48075
(313) 251-1399
mhanna@forthepeople.com

**Attorneys for Plaintiffs**